**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Case No. 19-22250-CIV-UNGARO/O'SULLIVAN**

**TAMMY FONS,**

      **Plaintiff,**

**v.**

**ANDREW SAUL,**
**Commissioner of,**
**Social Security Administration,**

      **Defendant.**
_____/

## REPORT AND RECOMMENDATION

THIS MATTER is before the Court on the Plaintiff's Motion for Summary Judgment (DE # 14, 12/04/2019) and the Defendant's Motion for Summary Judgment (DE # 15, 12/31/2019). The plaintiff requests the final decision of the Commissioner of Social Security be reversed and Disability Insurance Benefits to be granted. Alternatively, the plaintiff requests a remand under sentence four (4) of 42 U.S.C. § 405(g), with instructions to "(1) properly address all medical evidence and opinions; (2) reassess Ms. Fons' residual functional capacity [RFC] based on all of the evidence of record; (3) reassess Ms. Fons' allegations of symptoms and limitations; and (4) issue a new decision."(DE # 17, 1/30/2020, at p. 7). The complaint was filed pursuant to the Social Security Act, 42 U.S.C. § 405(g) (the "Social Security Act"), and is properly before the Court for judicial review of a final decision of the Commissioner of the Social Security Administration. This matter was referred to the undersigned by the Clerk's Notice of Magistrate Assignment (DE # 2, 06/03/2019). Having carefully considered the filings and applicable law, the undersigned recommends that the Defendant's Motion for Summary Judgment (DE # 15, 12/31/2019) be **GRANTED** and the Plaintiff's Motion for Summary Judgment (DE # 14, 12/04/2019) be **DENIED** in accordance with the following Report and Recommendation.

## PROCEDURAL HISTORY

On July 17, 2015, Tammy Fons ("the plaintiff") filed a Title II application for a Period of Disability and Disability Insurance Benefit, alleging her disability began December 19, 2014. The plaintiff's claims were initially denied on February 10, 2016, and upon reconsideration on June 2, 2016. Thereafter, the plaintiff filed a written request for a hearing on June 15, 2016. The plaintiff appeared and testified before an Administrative Law Judge ("ALJ") on December 7, 2017. (Tr. 10, 27-60). After considering the evidence, the ALJ determined that the plaintiff was not under a disability within the meaning of the Social Security Act, from December 19, 2014, through September 4, 2018, the date of the decision. (Tr. 21). The plaintiff filed a request for review of the ALJ's decision. On April 1, 2019, the Appeals Council denied the request for review. The ALJ's decision became the final decision of the Commissioner. (Tr. 1-6, 158-60).

## FACTS

### I. Plaintiff's Background

The plaintiff was born in September 1977. (Tr. 33). The plaintiff has a Masters Degree in Education. (Tr. 35). Since 1999, the plaintiff worked as an elementary school teacher for a couple of years and a middle school teacher for over ten years. (Tr. 35). The plaintiff stopped working in 2014 because she began to feel sick. (Tr. 35-36). The plaintiff testified she began to feel a lot of pain, fatigue, and cognitive dysfunction, even rendering her incapable to cognitively think where to put her fingers on devices such as a keyboard. (Tr. 48). The plaintiff lives with her mother. The plaintiff states she is housebound, stays mostly in bed, and requires assistance with activities of daily living. (Tr. 858).

In August 2013, the plaintiff began treating with her primary care physician and various

2

other medical practitioners. The medical history and other evidence reflects that the plaintiff suffered from myalgic encephalomyelitis/chronic fatigue syndrome, fibromyalgia, Epstein Barr virus, peripheral neuropathy, and cognitive impairment.(Tr. 281-98, 301-12, 337-74, 415-39, 482-585, 586-600, 606-728).

## II. Medical Treatment History

Joseph Mouhanna, M.D.

On August 12, 2013, the plaintiff was treated for her cervical, shoulder, lower back, and leg pain by Dr. Mouhanna, a pain medicine specialist. (Tr. 295).  The plaintiff's pain began a year before her initial visit with Dr. Mouhanna, and had worsened over time. (*Id.*). The plaintiff's pain interfered with her daily activities, physical activities, physical functions, quality of life, sleep at night, and mood. (Tr. 289). Dr. Mouhanna's examinations found the plaintiff suffered from severe pain, hypoesthesia at L5, S1, C6, and C7 dermatomes bilaterally. (Tr. 297). Dr. Mouhanna found decreased shoulder, cervical, and lumbar spine range of motion due to pain. (*Id.*). Dr. Mouhanna found tenderness to palpation with trigger points in the cervical spine, tenderness to L5 and S1 neuroforamen bilaterally in the lumbar spine and L3 through S1 facet joint tenderness bilaterally, and rhomboid tenderness with trigger points. (*Id.*).  Dr. Mouhanna found evidence of active trigger points in the lumbar spine musculature bilaterally and right trapezius and rhomboid muscle spasm with active trigger points. (Tr. 283, 287, 293, 297).

Tamar S. Ference, M.D.

The plaintiff saw Dr. Ference, a physical medicine and rehabilitation physician, from December 30, 2013, until January 27, 2014. (Tr. 301, 326).  The plaintiff reported having "pain all over", difficulty sleeping and fatigue worsening for one year. (Tr. 301). The plaintiff's symptoms

interfered with all activities of daily living and became worse with all physical activities and extreme temperature changes. (*Id*.). The plaintiff experienced no relief from medications, physical therapy, acupuncture, or injections. (Tr. 301-02, 306-07, 318, 326). Dr. Ference diagnosed the plaintiff with Fibromyalgia and Chronic Fatigue Syndrome (CFS). (Tr. 327-28, 332).

Leonard Kalman, M.D.

Dr. Kalman, an oncologist,  examined the plaintiff in September 2014 as a follow up to the plaintiff's remote Hodgkin's disease in 2001. (Tr. 337). Dr. Kalman found no evidence of recurrent Hodgkin Disease but noted the new diagnosis of Fibromyalgia and Chronic Fatigue Syndrome. (Tr. 337, 339).

Harry Aldrich, M.D.

The plaintiff treated with cardiologist Dr. Aldrich from June 25, 2014, through April 6, 2015, due to a rapid heart rate and vertigo. (Tr. 415-443). An electrocardiogram indicated a sinus tachycardia with trace mitral regurgitation and mild tricuspid regurgitation; the physical examination was otherwise normal. (Tr. 416-24). From January 2015 through April 2015 the plaintiff reported continuing episodes of nearly fainting despite medication adjustments. (Tr. 434-41).

John Dylewski, M.D.

The plaintiff treated with cardiologist Dr. Dylewski from May 21, 2015, through May 11, 2017, (Tr. 462-77, 581, 982-84), to address her constant dizziness, palpitations, severe fatigue, occasional nausea and presyncope, with symptoms worse with standing. (Tr. 466). A June 10, 2015, tilt table test was deemed negative but with features consistent with dysautonomia. (Tr. 462, 469). At the final evaluation in May 2017, the doctor's impression was tachycardia and

4

probably dysautonomia..[1] (Tr. 982).

<u>Center for Arthritis and Rheumatic Diseases</u>

The plaintiff treated with various providers at the Center from February 10, 2014, through October 9, 2017, for fibromyalgia and chronic fatigue. (Tr. 731-80). The plaintiff reported her symptoms began in 2012, and became worse with acupuncture, physical therapy, and Savella[2]. The plaintiff indicated she felt worse on February 10, 2014, then she did when she underwent chemotherapy. (Tr. 774). The plaintiff reported abdominal pain, arthralgia, back pain, difficulty concentrating, fatigue, headache, muscle spasms, muscle stiffness, muscle tenderness, muscle weakness, nausea with generalized weakness, malaise, myalgia, and numbness of the extremities. (Tr. 774-75). In March, April, and May 2014, the plaintiff's medications were adjusted and changed for ongoing fibromyalgia pain and chronic fatigue. (Tr. 762-70). Each of those times, 18/18 tender points were noted on examination. (Tr. 762-70). In September 2014, the plaintiff reported that she was not able to teach because she did not have the energy to stay awake, and was in too much pain to sit for 1-2 hours at a desk. (Tr. 756). The office visit note from September 3, 2014, indicated that the plaintiff was depressed because she was unable to do normal things such as stand for more than 15 minutes. The plaintiff also indicated she wanted to stop taking all of her medications. (Tr. 756). The plaintiff's medications for fibromyalgia

---

[1] "Dysautonomia is an umbrella term used to describe several different medical conditions that cause a malfunction of the Autonomic Nervous System." Dysautonomia.org, http://www.dysautonomiainternational.org/page.php?ID=34 (last visited April 2, 2020).

[2] "Savella (milnacipran) affects certain chemicals in the brain called neurotransmitters. An abnormality in these chemicals is thought to be related to fibromyalgia." It's used to treat the chronic pain caused by fibromyalgia. Savella, Drugs.com, https://www.drugs.com/savella.html (last visited March 10, 2020).

symptoms were adjusted, and the plaintiff was referred to Dr. Nunez for a second opinion and other treatment options. (Tr. 758). Notes from a November 5, 2014, visit indicate that the plaintiff was "pushing herself to work" for two hours twice a week, but it was "wearing her out." (Tr. 752). The plaintiff was struggling financially, but unsure if she was able to keep working because of her medical problems. (Tr. 752). Notes from a May 2015 visit indicated that the plaintiff was unable to return to work and her medications did not help with her pain or fatigue. (Tr. 744).

In November 2015, March 2016, September 2016, March 2017, and June 2017, the plaintiff reported times when she was so fatigued she was unable to take deep breaths, she was frustrated by the lack of improvement in her symptoms, and she was still unable to work because of pain and fatigue. (Tr. 731, 735, 739, 946, 950). Adjustments of the plaintiff's pain medications continued, which included Tramadol, Robaxin, Belsomera, and Hydrocodone for pain flares in September 2016 and March 2016, and Amrix (muscle relaxant) was added in June 2017. (Tr. 946, 948, 950, 952, 954, 957). On September 22, 2017, the plaintiff reported morning stiffness lasting about one hour. (Tr. 941).

Maria Vera Nunez, M.D.

Neuroimmune specialist Dr. Vera Nunez treated the plaintiff from September 25, 2014, through July 20, 2017. (Tr. 482-567, 656-79, 816-17, 830-935, 987-1026). At the initial appointment, the plaintiff reported chronic fatigue, diffuse muscle and joint pain, and orthostatic symptoms. (Tr. 482). The plaintiff felt "fatigued more than 4 times a week" and never felt well. (Tr. 483). The plaintiff's fatigue got worse with physical and mental exertion. ( *Id.*). The plaintiff complained of widespread pain. (*Id.*). The plaintiff's pain interfered with her daily activities

100% of the time. (*Id.*). As noted in the notes of Dr. Nunez from September 25, 2014, on the
Chronic Fatigue Syndrome Symptom Questionnaire, the plaintiff endorsed the presence of all 54
symptoms for the six months prior. (Tr. 485). Dr. Nunez summarized the plaintiff's medical
history, noting that most recently she: (1) was unable to tolerate Savella and Nuvigil due to
palpitations; (2) discontinued Lyrica due to increased pain, fatigue, and vision changes; (3)
experienced no improvement with Soma or muscle relaxants; (4) recently discontinued low dose
naltrexone (LDN) due to nausea and worsening pain; (5) improved with "Meyer's cocktails" and
a hyperbaric chamber; and (6) was taking Tramadol, Amrix, pindolol, and Ambien. (Tr. 483-84).
Dr. Nunez assessed chronic fatigue and immune system dysfunction syndrome (CFIDS)
manifested as pathologic fatigue, post exertional malaise, sleep problems, diffuse muscle and
joint pain, neurocognitive, autonomic, neuroendocrine and immune symptoms. (Tr. 488). The
plaintiff met the criteria for CFS/ME [chronic fatigue syndrome/myalgic encephalomyelitis].
(*Id.*). Dr. Nunez suggested the plaintiff exercise only while lying down or sitting with breaks as
needed. (*Id.*).

By November 2014, the plaintiff had significant pain ranging from 6-9/10 in severity that
interfered with her activities 100% of the time. (Tr. 491). The plaintiff also had a fluctuating
fatigue level with relapses once a week. (Tr. 490). The plaintiff was not able to get out of bed,
and had to push herself to work 2 days a week. (*Id.*). Her fatigue levels ranged from 8-10/10 in
severity, she endorsed 53 out of 54 CFS symptoms, and her other symptoms were the same. (Tr.
490-92). The plaintiff's assessment was persistent with post exertional fatigue, her immune work
up showed a marked impairment of natural killer cytotoxic function. (Tr. 494). The plaintiff also
presented an abnormal cytokine pattern with elevated inflammatory cytokines and decreased

antiinflammatory ones. (Tr. 494).

In January 2015, March 2015, April 2015, June 2015, and July 2015, the plaintiff's symptoms remained similar with regard to her pain levels, the pain's interference with the plaintiff's activities of daily living, the plaintiff's fatigue levels, and the plaintiff's CFS symptoms.  (Tr. 496-98, 500, 502-15, 517-22, 524-30, 656-65).  In December 2015, Dr. Nunez found negative results in the plaintiff for extremity weakness, flank pain, and muscle weakness.(Tr. 660-61).

On January 13, 2016, Dr. Nunez completed a Supplemental Mental Impairment Questionnaire. Dr. Nunez found the plaintiff's grip strength, upper, and lower extremities strength to be "4/5 bilaterally", however the plaintiff was unable to sustain such grip for more than 5 seconds due to pain. (Tr. 579). With respect to muscle strength testing, Dr. Nunez opined that the plaintiff had 4/5 bilateral upper extremities and lower extremities strength, but was not able to sustain activity due to pain.  *Id*.   Dr. Nunez also commented on the plaintiff's gait and station, finding the plaintiff ambulated slowly and required assistance. (*Id*.).

On February 4, 2016, Dr. Nunez completed a Treating Source Mental Status Report at the Commissioner's request, noting the plaintiff was "able to concentrate for short periods at a time (5-10 minutes)." (Tr. 604). Prolonged concentration caused brain fog in the plaintiff and the plaintiff had difficulty paying attention. (*Id*.). In addition, the plaintiff had difficulty with immediate and recent memory and word-finding, which was "worse during relapse time[s]." (*Id*.). Dr. Nunez noted that the plaintiff came "to her appointments accompanied by her mother" and her mother provided "assistance with ambulation." (*Id*.). Dr. Nunez noted that there was no cure for Chronic Fatigue Syndrome and that "management is supportive and symptom control."

(*Id*.). Dr. Nunez noted the plaintiff had "abnormal immune testing indicating neuro inflammation that worsens cognitive symptoms" and while she could follow instructions, she was "not able to maintain attention and concentration for prolonged time." (Tr. 605). Dr. Nunez opined the plaintiff could not sustain a 40-hour work week because the plaintiff suffered from persistent mental exertion causing "brain fog." (*Id*.).

In February 2016, April 2016, July 2016, and April 2017 the plaintiff reported continued ongoing symptoms.  (Tr. 668-76, 832-843, 846-55, 858, 867, 868).  The symptoms and limitations remained basically the same, with only a few exceptions, and the plaintiff resided with her mother.  (*Id*.). In April 2017, Dr. Nunez assessed that the plaintiff's neuropathy was immune mediated, that the plaintiff's pain was worsening, and referred the plaintiff to a rheumatologist for further evaluation. (Tr. 867).

On November 7, 2017, Dr. Nunez provided a sworn statement regarding the plaintiff's diagnoses and treatment. (Tr. 987-1031). Dr. Nunez testified that she was board certified in both internal medicine and integrative medicine, trained in functional medicine, an assistant professor of Clinical Immunology, and engaged in research on chronic fatigue syndrome and chronic inflammation. (Tr. 988-89). Dr. Nunez started evaluating and treating patients and researching chronic fatigue syndrome in 2008. (Tr. 990). Dr. Nunez explained that integrative medicine involves "multiple tools to help patients with chronic conditions. We still use elements of our formal training with medications, procedures, surgeries, but we also add other tools, including treatments that are more holistic", supplements, or other interventions. (Tr. 989). The plaintiff's diagnoses were chronic fatigue syndrome/myalgic encephalomyelitis, fibromyalgia and autonomic dysfunction, Epstein-Barr virus with viral reactivation, immune dysfunction, and was

being evaluated for hyper IgG4 related disease, which was an antibody elevation associated with organ problems. (Tr. 991). Regarding cell mediated immune deficiency, Dr. Nunez explained that it was "part of the spectrum of symptoms we find in chronic fatigue syndrome. There's a disbalance in the way that the immune system responds and in this case the part of the immune system that deals with viruses is weaker and is not working properly." (Tr. 992-93). Dr. Nunez explained the plaintiff tested positive/abnormal for various viruses, including Epstein-Barr, Coxsackie B, human herpes 6, which causes flu-like symptoms, malaise, sore throat and also inflammation of lymph nodes. (Tr. 993-94). Dr. Nunez indicated the plaintiff satisfied all chronic fatigue syndrome (CFS) criteria. (Tr. 996). The plaintiff had headaches daily and felt "very tired all the time." (Tr.1002).  The plaintiff's condition was worsening and "multiple medications and interventions" could not be tolerated. (*Id.*).  Dr. Nunez continued to opine the plaintiff was "bed bound" and continued to live with her parents. (Tr. 1004). Dr. Nunez opined the plaintiff was not capable of sedentary activity, because the plaintiff was "bed bound" and was "only able to tolerate minimal amount of sitting up or standing up position, no longer than five minutes at a time." (Tr. 1012).  According to Dr. Nunez, the plaintiff sometimes required assistance with certain activities of daily living, including washing, showering, and dressing herself. Dr. Nunez also noted that the plaintiff was not able to lift any weight at the time. (Tr. 1012-13).

Jeffrey S. Ritter, M.D.

In October 2017, Jeffrey Ritter, M.D., a rheumatologist, noted the plaintiff's diagnoses and treatment in conjunction with Dr. Nunez, and that "[s]he has been treated with various different treatments over time, including antiviral and Trental, but nothing has helped, in fact some have been detrimental. The pain and the fatigue are limiting her activities." (Tr. 937). Dr.

Ritter also noted abdominal pain, generalized pain, facial swelling, periodic cough and shortness of breath, and "headaches all the time." (Tr. 937). Dr. Ritter also noted that Dr. Mouhanna previously diagnosed the plaintiff with small fiber neuropathy with elevated inflammatory markers. (Tr. 937). On examination, Dr. Ritter noted diffuse abdominal tenderness, joint tenderness of the upper and lower extremities, and fibromyalgia tender points. (Tr. 939). Dr. Ritter reiterated the  diagnoses of fibromyalgia, cervical spondylosis, and chronic fatigue, for which he continued medications and recommended as much stretching and aerobic exercise as possible for the plaintiff. (Tr. 939).

Thomas Bixler, M.D.

In April 2016, Thomas Bixler, M.D., reviewed treatment records though March 23, 2016, (Tr. 84-89), and opined the plaintiff could: (1) lift less than ten pounds frequently and up to ten pounds occasionally; (2) stand or walk two hours; (3) sit about six hours in an eight-hour workday; and (4) had to avoid even moderate exposure to hazards. (Tr. 84-86). Dr. Bixler opined that the plaintiff's RFC was reduced significantly due to pain and fatigue, and that she should be capable of sedentary work. (Tr. 87).  The record notes that on December 28, 2015, the plaintiff reported that she would not attend her consultative examinations (CE's), and asked to cancel her CE's, because Dr. Nunez deemed them medically unnecessary. (Tr. 86).

Barbara Lewis, Ph.D.

In May 2016, psychologist Barbara Lewis, Ph.D., reviewed the January 13, 2016, and February 4, 2016, statements and the February 2015, and July 2015, records from Dr.Nunez. Dr. Lewis opined the plaintiff had a "moderate" limitation in maintaining concentration, persistence or pace, but "mild" limitations in activities of daily living and maintaining social functioning.

11

(Tr. 82). Dr. Lewis opined the plaintiff could "understand, retain, and carry out simple instructions . . . . perform routine tasks on a sustained basis with normal supervision, cooperate adequately with others, adapt over time to most changes and task demands, make simple decisions and take appropriate precautions for normal hazards." (Tr. 89).

### III.   Hearing Testimony

Plaintiff's Testimony

On December 7, 2017, the plaintiff, her attorney, and a Vocational Expert attended the ALJ hearing. (Tr. 27). At the time of the hearing, the plaintiff was 40 years old, was accompanied by her mother, and was using a wheel chair. (Tr. 34). The plaintiff testified that she lived with her mother and arrived to the hearing by taking an Uber because she was incapable of driving. (Tr. 33-34). The plaintiff testified that beginning in 1999 she worked as an elementary school teacher for a couple of years and then over ten years as a middle school teacher, and the last time she worked as a teacher was in 2014. (Tr. 35). The plaintiff testified she attempted to tutor but could not. ( *Id.*). The plaintiff testified that she had to stop working due to severe pain in her neck, shoulder, arms, legs, stomach and pelvis areas, as well as due to fatigue, and cognitive dysfunction. (Tr. 36). The plaintiff testified that her pain, fatigue, cognitive function, and sensitivity to light and sound had worsened over time, and while she could stand and walk, her walking was limited to the restroom and back, after which she would "feel like throwing up, and I have to lie down right away." (Tr. 38). The plaintiff sometimes required assistance from her mother to get to the bathroom, and was unable to use a walker or cane due to upper extremity pain. (Tr. 38-39). The plaintiff could not stand more than five minutes, after which she would feel faint and nauseous, and she could carry her purse but not hold her phone. (Tr. 39-40). The

12

plaintiff alternated between sitting and lying down "constantly", generally alternating between lying down and sitting every 30 minutes throughout the day and night. (Tr. 40, 42). The plaintiff testified that she had been sitting in the wheelchair about two hours that day due to the hearing, felt very unwell, and did not usually sit that long. (Tr. 41-42). The plaintiff stated, "I only get up for the restroom, and I sit up for eating, and that's it." (Tr. 43). Due to the hearing, she estimated she would be bedridden for a week. (Tr. 53). The plaintiff  testified that her mother does all the chores around the house because the plaintiff is incapable of doing so. (Tr. 45).  The plaintiff testified she feels "no energy" when she wakes up and she does not get "refreshing sleep" due to the fatigue and pain from the fibromyalgia. (Tr. 46).  The plaintiff also testified that she visits Dr. Nunez every two to three months and receives numerous "antivirals and immunosuppressants", but the medication worsened her symptoms instead of helping her. (Tr. 47, 54). The plaintiff testified she can no longer use her hands for "writing, typing, mousing, [or] keyboarding" because her hands hurt and she "can not cognitively think where to put [her] fingers on the keys." (Tr. 48). The plaintiff testified that her "best pain level" she felt was a seven out of ten, where ten is the worst pain for the headaches, stomach spasm, and fibromyalgia (Tr. 49-52). The plaintiff testified she would not be able to "sit or alternately sit or stand for an eight-hour day without being able to lay down." (Tr. 53).

<u>Vocational Expert (VE) James E. Miller' Testimony</u>

Mr. James E. Miller, a VE, testified at the ALJ hearing and classified the plaintiff's past work. The VE classified the plaintiff's first job as a teacher as having a Specific Vocational Preparation (SVP) of 7 and also as light per the DOT and the claimant's report. (Tr. 56). The VE classified the plaintiff's second job as a tutor as an SVP of 7, and light per the DOT and the

claimant's report. (*Id.*). Thereafter, the ALJ posed a hypothetical to the VE mirroring the plaintiff's age, education, and work experience. (*Id.*). The ALJ also asked the VE to assume that the hypothetical individual would be limited to the sedentary exertional level with additional limitations. The limitations were: the individual can never climb ladders, ropes, or scaffolds; must avoid concentrated exposures to extreme heat, extreme cold, vibrations, and avoid hazards; can understand, remember, carry out short, simple instructions, and make simple work related decisions; is limited to frequent interaction with supervisors, coworkers, general public, and can respond appropriately to changes in a routine work setting.  (*Id.*). Based on this hypothetical, the ALJ asked the VE if this individual was capable of performing the plaintiff's past work. The VE testified that the hypothetical individual could not perform the plaintiff's past relevant work. (*Id.*). However, the VE identified a few unskilled jobs that the hypothetical individual may perform, such as a document preparer, a surveillance system monitor, and an order clerk for food and beverages. (Tr. 57). The VE indicated that these types of jobs existed in the national economy. (*Id.*).

## THE ALJ'S DECISION-MAKING PROCESS

"Disability" is defined as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can last for a continuous period of not less than twelve months." 42 U.S.C. §§ 416(I); 423(d)(1); 20 C.F.R. § 404.1505 (2005). The impairment(s) must be severe, making the plaintiff "unable to do his previous work . . . or any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 423(d)(1); 20 C.F.R. §§ 404.1505-404.1511 (2005).

To determine whether the plaintiff is entitled to disability benefits, the ALJ must apply a

five-step analysis. 20 C.F.R. § 404.1520(a). The ALJ must first determine whether the plaintiff is presently employed or engaging in substantial gainful activity. If so, a finding of non-disability is made and the inquiry ends. 20 C.F.R. § 404.1520(a)(4)(i)

Second, the ALJ must determine whether the plaintiff suffers from a severe impairment or a combination of impairments. If the plaintiff does not, then a finding of non-disability is made and the inquiry ends. 20 C.F.R. § 404.1520(a)(4)(ii).

Third, the ALJ compares the plaintiff's severe impairments to those in the listings of impairments located in Appendix I to Subpart 404 of the Code of Federal Regulations. 20 C.F.R. § 404.1520(d), Subpart P, Appendix I. Certain impairments are so severe, whether considered alone or in conjunction with other impairments, that if such impairments are established, the regulations require a finding of disability without further inquiry into the plaintiff's ability to perform other work. *See, Gibson v. Heckler*, 762 F.2d 1516, 1518 n.1 (11th Cir. 1985). If the impairment meets or equals a listed impairment, disability is presumed, and benefits are awarded. 20 C.F.R. § 404.1520(d). If it does not, the analysis proceeds to the next step.

Fourth, the ALJ must determine whether the plaintiff has the "residual functional capacity" to perform his or her past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). "Residual functional capacity" is defined as "what you can do despite your limitations." 20 C.F.R. § 404.1545(a)(1). This determination takes into account "all relevant evidence," including medical evidence, the claimant's own testimony and the observations of others. *Id.*. If the plaintiff is unable to perform his or her past relevant work, then a prima facie case of disability is established and the burden of proof shifts to the Commissioner to show at step five that there is other work available in the national economy which the plaintiff can perform. *Dominguez v. Astrue*, No.0821494 2009 U.S. Dist. LEXIS 73434,

15

at* 14 (S.D. FL. July 29, 2009); 20 C.F.R. § 404.1520(e)-(9); *see, Barnes v. Sullivan*, 932 F.2d 1356, 1359 (11th Cir. 1991) (The claimant bears the initial burden of proving that he is unable to perform previous work.).

Fifth, the ALJ must determine whether the plaintiff is able to do any other work considering her residual functional capacity (RFC), age, education, and work experience to see if the plaintiff can make an adjustment to other work. If the plaintiff can make an adjustment to other work, the plaintiff will be found to not be disabled. In other words, if the plaintiff cannot perform her past relevant work, the ALJ must decide if she is capable of performing any other work in the national economy. 20 C.F.R. § 404.1520(a)(4)(iv).

## THE ALJ'S FINDINGS

On September 4, 2018, the ALJ found that the plaintiff was not disabled under sections 216 (I) and 223(d) of the Social Security Act. (Tr. 21). At step one, the ALJ found that the plaintiff was not presently participating in and had not participated in any substantial gainful activity since her alleged onset date of disability, December 19, 2014. (Tr. 12).

At step two, the ALJ found that the plaintiff had the following severe impairments: myalgic encephalomyelitis/chronic fatigue syndrome, fibromyalgia, Epstein Barr virus - viral reactivation, peripheral neuropathy, and cognitive impairment. (*Id.*). The ALJ found that the plaintiff's impairments constitute more than slight abnormalities and have had more than a minimal effect on the plaintiff's ability to perform basic work activities for a continuous period of 12 months. (*Id.*). The ALJ also found the plaintiff's EMG/NCV studies showed no evidence of lumbar or cervical radiculopathy. (*Id.*). Moreover, the plaintiff demonstrated some hypoesthesia but her muscle strength, reflexes, and coordination were all normal. (*Id.*). In addition, the plaintiff's later CT scans

16

of her hip, cervical spine, and shoulder revealed no abnormal findings. (Tr. 13). The ALJ found the plaintiff's spinal impairment non-severe. (*Id.*).

At step three, the ALJ found that the plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526)." (*Id.*). The ALJ found the plaintiff's fibromyalgia and chronic fatigue syndrome do not meet the criteria of any listing. (*Id.*). Moreover, the plaintiff's peripheral neuropathy does not meet the listing because she does not have "disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station." (*Id.*).

In addition, the ALJ found that the plaintiff's mental impairments do not meet the criteria listing. (*Id.*). The ALJ found the plaintiff had moderate limitation in: "understanding, remembering, or applying information; interacting with others; concentration, persisting or maintaining pace; [and] adapting or managing themselves." (Tr. 13). The ALJ opined that the plaintiff's mental impairment did not have "at least one extreme or two marked limitations" as required for a finding of disability under "Paragraph B" in Section 12.02 of the Social Security Adult Disability Evaluation.[3] (Tr. 13-14).

The ALJ also considered and found the plaintiff was not "under any kind of structured setting or other treatment that diminishes the signs or symptoms of her medical disorder." (Tr. 14). According to the ALJ the record fails to establish that the plaintiff only had a "a minimal capacity to adapt to changes in the plaintiff's environment or to demands that are not already part of the

---

[3] https://www.ssa.gov/disability/professionals/bluebook/12.00-MentalDisorders-Adult.htm#12_02.

plaintiff's daily life." (*Id.*).

> Before considering step four, the ALJ found that the plaintiff:

> has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567 (a) except she can never climb ladders, ropes, or scaffolds . . . must avoid concentrated exposure to extreme cold and heat, avoid concentrated exposure to vibration, and workplace hazards . . . can understand, remember, and carry out short, simple instructions and make simple work related decisions . . . limited to frequent interaction with supervisors, co-workers, and the general public . . . [and] can respond appropriately to changes in a routine work setting.

(Tr. 14-15).

The ALJ found the plaintiff's impairment could reasonably cause her symptoms. However, the ALJ found the plaintiff's "statements concerning the intensity, persistence, and limiting effect of these symptoms" inconsistent with the medical records. (Tr. 16). The ALJ found the record contained little evidence to substantiate the plaintiff's reported impairments. The ALJ also noted the plaintiff's "specialized evaluations including neurological tests, cardiovascular exams, and opthlamological exams were all unremarkable." (*Id.*). The ALJ noted the CT scans of the plaintiff's hip, cervical spine, and shoulders revealed "no abnormal finding." (*Id.*). Also, the plaintiff's "head-up" tilt evaluation was negative. (Tr. 16). The ALJ found Dr. Nunez's 2016 report, which indicated the plaintiff had "decreased strength in her upper and lower extremities and ...not able to sustain physical activity" inconsistent with the plaintiff's physical exam from one month earlier, which documented no extremity weakness, gait disturbance, or numbness and a normal range of motion throughout. (Tr. 19).

> At step four, the ALJ found that the plaintiff does not have the RFC to perform the requirements of any past relevant work. (Tr. 20).

At the last step of the sequential evaluation process, the ALJ determined, after "considering the plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the plaintiff can perform." (*Id.*). Accordingly, the VE testified that plaintiff would be able to perform occupations such as: "Document Preparer," "Surveillance System Monitor," and "Order Clerk." (Tr. 21).

The ALJ found that these impairments do not cause the degree of limitations claimed by the plaintiff. (Tr. 18). The ALJ found these limitations "so extreme as to be implausible." (*Id.*). Furthermore, the ALJ found the plaintiff's complaints were "exaggerated" and "inconsistent" with the record. (*Id.*).

The ALJ concluded that the plaintiff is capable of making a successful adjustment to other work that exists in significant numbers in the national economy. (Tr. 21). The ALJ did not find the plaintiff was "disabled" under the framework of the above cited rule. (Tr. *Id.*).

## STANDARD OF REVIEW

In reviewing claims brought under the Social Security Act, the Court must determine whether it is appropriate to grant either party's motions for summary judgment. Judicial review of the factual findings in disability cases is limited to determining whether the record contains substantial evidence to support the ALJ's findings and whether the correct legal standards were applied. 42 U.S.C.S. § 405(g) (2006); *see, Wolfe v. Chater*, 86 F.3d 1072, 1076 (11th Cir. 1996) (holding that the reviewing court must not re-weigh evidence or substitute their discretion). On judicial review, decisions made by the Commissioner of Social Security are conclusive if supported by substantial evidence and if the correct legal standard was applied. 42 U.S.C.S. § 405(g) (2006); *Kelley v. Apfel*, 185 F.3d 1211, 1213 (11th Cir. 1999). "Substantial evidence" is more than a

scintilla, but less than a preponderance and is generally defined as such relevant evidence which a reasonable mind would accept as adequate to support a conclusion. *See, Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996). In determining whether substantial evidence exists, "the court must view the record as a whole, taking into account evidence favorable as well as unfavorable to the decision." *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995).

The restrictive standard of review, however, applies only to findings of fact. No presumption of validity attaches to the Commissioner's conclusions of law, including the determination of the proper standard to be applied in reviewing claims. *See, Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991) ("Commissioner's failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal."); *accord, Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).

The reviewing court must be satisfied that the decision of the Commissioner is grounded in the proper application of the appropriate legal standards. *See, Davis v. Shalala,* 985 F.2d 528, 531 (11th Cir. 1993). The court may not, however, decide the facts anew, re-weigh evidence or substitute its judgment for that of the ALJ, and even if the evidence weighs against the Commissioner's decision the reviewing court must affirm if the decision is supported by substantial evidence. *See, Miles*, 84 F.3d at 1400; *see also Baker v. Sullivan*, 880 F.2d 319, 321 (11th Cir. 1989). Factual evidence is presumed valid, but the legal standard applied is not. *See, Martin*, 894 F.2d at 1529. The Commissioner must apply the correct legal standard with sufficient reasoning to avoid reversal. *Id*

## LEGAL ANALYSIS

The plaintiff asserts that the ALJ committed reversible error and the decision is not based on substantial evidence. The plaintiff seeks reversal of the final decision in accordance with the

fourth sentence of 42 U.S.C. § 405(g) or a remand of this case for an award of benefits based on a finding that the plaintiff is disabled. "Disability" is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(E).  The undersigned finds that the ALJ's findings correctly applied the legal standard and the ALJ's decision should be AFFIRMED.

**I.  Whether the ALJ Properly Considered and Weighed the Opinions of Plaintiff's Treating Physicians.**

**A. Dr. Nunez's Opinion**

A treating physician's medical opinion is entitled to considerable weight if supported by the evidence and consistent with the doctor's own records. *See Winschel v. Comm'r of Soc. Sec.,* 631 F.3d 1176, 1179 (11th Cir. 2011). Nonetheless, an ALJ may minimize a treating physician's opinion, as long as the ALJ's decision is supported by substantial evidence, or when the doctor's opinion is not followed by objective medical evidence or is wholly conclusory or is inconsistent with the physicians own medical records. *See Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1159, 1160 (11th Cir. 2004) (discounting a physician's opinion when the ALJ's decision was supported by substantial evidence); *see also Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir. 2004). With "good cause", an ALJ may disregard a doctor's opinion, but must articulate the reasons for doing so. *Winschel,* 631 F.3d at 1179. The reviewing court must not "second guess the ALJ about the weight the treating physician's opinion deserves" as long the ALJ articulates a specific justification for it. *Hunter v. Soc. Sec. Admin.*, 808 F.3d 818, 823 (11th Cir. 2015).

Here, the ALJ gave the opinion of  Dr. Nunez little weight because the ALJ  found the

doctor's statements inconsistent with or unsupported by the record. The ALJ acted with good cause and relied on substantial evidence for discounting Dr. Nunez's opinion. *See Winschel,* 631 F.3d at 1179. "[T]he ALJ must state with particularity the weight given to different medical opinions and the reasons therefor." *Id.* Here, the ALJ's justifications for granting little weight to the plaintiffs's alleged impairments are the "very little evidence in Dr. Vera Nunez's treatment records" and that her reports are "inconsistent with other objective finding." (Tr. 19).[4] The ALJ referenced that "no imaging or nerve conduction study could verify the existence or severity" of the plaintiff's conditions. (*Id.*). The ALJ further noted that the plaintiff "estimated she could not stand for more than 5 minutes at one time before she becomes nauseated and feels that she will faint." (Tr. 15). The ALJ also noted the plaintiff's "specialized evaluations including neurological tests, cardiovascular exams, and opthlamological exams were all unremarkable." (Tr. 16). The ALJ noted the CT scans of the plaintiff's hip, cervical spine, and shoulders revealed "no abnormal finding." (Tr. 16). Also, the plaintiff's "head-up" tilt evaluation was negative. (Tr. 16). The ALJ gave little weight to the opinions of Dr. Nunez because the ALJ did not find the statements were supported or consistent with the record. (Tr. 19).

In addition, the ALJ had "good cause" when giving little weight to Dr. Nunez's opinion

---

[4] The plaintiff correctly notes that the ALJ incorrectly stated that Dr. Nunez opined that the plaintiff could not sustain physical activity for more than 5 seconds. Dr. Nunez actually opined that the plaintiff could not sustain a grip for more than 5 seconds. (Tr. 19, 579). This error, however, is not cause for remand because the ALJ properly noted that the opinion of Dr. Nunez that the plaintiff had decreased strength in her upper and lower extremities is inconsistent with the November 2015 examination findings. And that is just one example of how Dr. Nunez's opinion is inconsistent with objective findings (Tr. 19). The ALJ also gave more than one reason for discounting Dr. Nunez's opinion. *See D'Andrea v. Comm'r of Soc. Sec. Admin.*, 389 F. App'x 944, 947-948 (11th Cir. 2010) (rejecting the argument that the ALJ failed to accord proper weight to the treating physician's opinion "because the ALJ articulated at least one specific reason for disregarding the opinion and the record supports it.").

because the ALJ found that the treating physician's opinion was "inconsistent with the doctor's own medical records." *Phillips,* 357 F.3d at 1241. The ALJ found the doctor's 2016 report, which indicated the plaintiff had "decreased strength in her upper and lower extremities and ...not able to sustain physical activity" inconsistent with the plaintiff's physical exam from one month earlier, which documented no extremity weakness, gait disturbance, or numbness and a normal range of motion throughout. (Tr. 19, 579, 740-41).

The ALJ may disregard a doctor's opinion, but must articulate the reasons fo doing so. *See Winschel*, 631 F.3d at 1179. Here, the ALJ articulated specific justifications for giving Dr. Nunez's opinion little weight, which is supported by substantial evidence, as discussed above. Therefore, this Court should not "second guess" the ALJ's finding. *Hunter,* 808 F.3d at 823.

With respect to evaluating the plaintiff's subjective symptoms, subjective symptoms may support a finding of disability where the claimant shows "'evidence of an underlying medical condition and either [] objective medical evidence that confirms the severity of the alleged pain arising from that condition or [] that the objectively determined medical condition is of such severity that it can be reasonably expected to give rise to the alleged pain.'" *Hennes v. Comm'r of Soc. Sec.*, 130 F. App'x. 343, 347 (11th Cir. 2005) (quoting *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005)). Nonetheless, where the objective medical record fails to confirm the severity of a claimant's subjective symptoms, "the ALJ 'has the power and discretion to weigh all of the evidence . . . .'" *Holmes v. Comm'r of Soc. Sec.*, No. 17421, 2018 U.S. Dist. LEXIS 101077, at*10 (W.D. MI. June 18, 2018) (quoting *Workman v. Comm'r of Soc. Sec.*, 105 Fed. Appx. 794, 801 (6th Cir. 2004)). The ALJ applied Social Security Ruling (SSR) 12-2p, which provides guidance on how to "develop evidence to establish that a person has a medically determinable impairment [] of fibromyalgia . .

23

. ." SSR 12-2p, 2012 SSR LEXIS 1, at *1. Accordingly, the ALJ found that the plaintiff's chronic fatigue syndrome and fibromyalgia were severe impairments. (Tr. 12). The SSR states for an ALJ to find a person with fibromyalgia to be disabled, the ALJ must "properly consider the person's symptoms" and "ensure there is sufficient objective evidence to support a finding that the person's impairment(s) so limits the person's functional abilities . . . ." SSR 12-2p, 2012 SSR LEXIS 1, at *2-3; *see also* Titles II and XVI: Evaluation of Fibromyalgia, 77 Fed. Reg. 43640, 43641 (S.S.A. July 25, 2012). The ALJ concluded that although there is substantial evidence of the plaintiff's subjective reporting of her fibromyalgia, chronic fatigue syndrome, and other symptoms, the record contained "very little in terms of objective finding." (Tr. 18).

In sum, the objective medical findings do not support the plaintiff's subjective complaints of disabling symptoms. The ALJ's finding that  Dr. Nunez's opinion is entitled to little weight satisfies the "more than a mere scintilla" threshold the Supreme Court requires. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154. (2019). More than a mere scintilla "means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek at* 1154, quoting *Consolidated Edison, Co. v. NLRB*, 305 U.S. 197, 229 (1938).  The record supports the ALJ's assignment of little weight to Dr. Nunez's opinion and the ALJ's  finding of non-disability.

**B. Dr. Bixler's Opinion**

Dr. Bixler issued his opinion that the RFC was "reduced significantly for pain, fatigue, [and the plaintiff] should be able to do sedentary work." (Tr. 84-87). The ALJ accorded "great weight" to Dr. Bixler's non-examining opinion. (Tr. 18). When the opinion of an examining physician is compared with an opinion of a non-examining physician,"the 'opinion of an examining physician is generally entitled to more weight than the opinion of a non-examining physician.'" *Broughton v.*

24

*Heckler*, 776 F.2d 960, 962. (11th Cir. 1985) (quoting *Oldham v. Schweiker*, 660 F.2d 1078, 1084 (5th Cir. 1981)). Also, the opinion of a non-examining physician is entitled to little weight and taken alone would "not constitute substantial evidence to support an administrative decision." *Swindle v Sullivan*, 914 F.2d 222, 226 n.3 (11th Cir. 1990). However, the ALJ gave good reasons, supported by substantial evidence, for giving great weight to Dr. Bixler's opinion that the plaintiff could perform work at the  sedentary exertional level but could never climb ladders, ropes, or scaffolds. (Tr. 18, 86-87). "[B]ecause nonexamining sources have no examining or treating relationship with you, the weight we will give their medical opinions will depend on the degree to which they provide supporting explanations for their medical opinions." 20 C.F.R. § 404.1527 (c)(3), (4). Here, The ALJ properly credited Dr. Bixler's opinion because it was supported by the objective finding, and his notes show that he thoroughly and appropriately reviewed the medical evidence including the plaintiff's subjective complaints. (Tr. 18, 86-87).

## II.  Whether the ALJ's Evaluation of Plaintiff's Symptoms was Supported by Substantial Evidence.

The ALJ must evaluate the intensity and persistence of a plaintiff's symptoms and their effect on the plaintiff's ability to work. *See* 20 C.F.R. § 404.1529(c)(1). In addition, the ALJ must consider factors such as the plaintiff's treatment history; the type, dosage, effectiveness, and side effects of any medication taken; treatment taken other than medication; any other measures used for relief of symptoms; statements by the plaintiff or medical sources about the symptoms; and evidence of daily activities. *See* 20 C.F.R. § 404.1529(a); *see also* 20 C.F.R. § 404.1529(c)(1)(3). In determining the extent of the plaintiff's symptoms impacting their capacity to perform basic work activities, the ALJ "will consider whether there are any inconsistencies in the evidence" and whether "there are any

conflicts between [the plaintiff's] statements and the rest of the evidence, including [the plaintiff's] history, signs and laboratory findings, and statements by medical sources or other persons about how your symptoms affect you." 20 C.F.R. § 404.1529(c)(4).

If the ALJ discredits the plaintiff's allegation of disabling symptoms, the ALJ must clearly "articulate explicit and adequate reasons" for discrediting the claimant's allegations of completely disabling symptoms. *Foote*, 67 F.3d at 1561 (11th Cir. 1995). Here, the ALJ appropriately considered the factors and articulated reasons why the plaintiff's subjective allegations regarding the nature and extent of the plaintiff's functional limitations were not entirely consistent with the medical evidence. (Tr. 15-19). Here, the ALJ found that the record contained "very little to substantiate the claimant's reported symptoms." (Tr.16). Also, the ALJ noted inconsistencies between the plaintiff hearing testimony and the treatment records. (Tr. 18). Here, the plaintiff testified that "her symptoms continued to worsen", which the ALJ found inconsistent with the fact she was already housebound in April 2016, and "later evidence described her symptom as 'morning stiffness' lasting for about an hour." (*Id*, Tr. 38, Tr. 941). Moreover, although the ALJ noted that the plaintiff came to the hearing using a wheelchair, and testified that she never left home without it, the ALJ found little evidence in the record that an assistive device was necessary. (Tr. 18, 34). The ALJ further noted that the plaintiff, at the hearing, was able to communicate her thoughts effectively with no apparent sign of the "brain fog" mentioned by Dr. Nunez. (Tr. 14, 604-05). The ALJ found that "such inconsistencies, in combination with the minimal objective evidence or physical exam findings render the extreme limitations less persuasive." (Tr. 18).

The ALJ found that although the plaintiff has medically determinable severe impairments, the impairments do not cause the degree of limitations alleged by the plaintiff. (Tr. 18). The ALJ

found the plaintiff's statements regarding her limitation are "so extreme as to be implausible." (Tr. 18). Also,  the plaintiff declined to attend her scheduled consultative examinations. (Tr. 18, 86). A claimant applying for benefits and not having a good reason for failing or refusing to take part in a consultative examination, may subject the claimant to a finding of not disabled. 20 CFR § 404.1518. Here, the plaintiff did not attend her scheduled consultative examination due to it being deemed "medically unnecessary" by her doctor, Dr. Nunez. Under, § 404.1518 (b)-(c), this does not qualify as a good reason for failure to appear to a scheduled examination and the administration was never informed of such objection by Dr. Nunez.

The ALJ concluded that the plaintiff's subjective complaints are "somewhat exaggerated and to be inconsistent with the other evidence and would not be a sound basis for a finding of disability." (Tr. 18). The undersigned agrees, and finds that the ALJ's decision was substantially supported by evidence in the record.

<u>**CONCLUSION**</u>

The undersigned reiterates, as stated earlier in this Report and Recommendation, that the court may not decide the facts anew, re-weigh evidence or substitute its judgment for that of the ALJ, and even if the evidence weighs against the Commissioner's decision the reviewing court must affirm if the decision is supported by substantial evidence. *See,  Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996)*.*  Moreover, also as stated earlier in this Report and Recommendation, the reviewing court must not "second guess the ALJ about the weight the treating physician's opinion deserves" as long the ALJ articulates a specific justification for it. *Hunter v. Soc. Sec. Admin.*, 808 F.3d 818, 823 (11th Cir. 2015).  In accordance with *Miles* and *Hunter*, the ALJ's decision is supported by substantial evidence, and accordingly, the undersigned recommends that the Social Security

Administation's finding of disability be affirmed.

## RECOMMENDATION

In accordance with the foregoing, it is

RESPECTFULLY RECOMMENDED that the decision of the Commissioner be **AFFIRMED**, the Defendant's Motion for Summary Judgment (DE # 15, 12/31/2019) be **GRANTED** and the Plaintiff's Motion for Summary Judgment (DE # 14, 12/4/2019) be **DENIED**. The parties have fourteen (14) days from the date of receipt of the Report and Recommendation within which to serve and file written objections, if any, with United States District Judge Ungaro. Failure to file objections timely shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report except upon grounds of plain error if necessary in the interest of justice. *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir 1989); 11th Cir. R. 3-1 (2016).

RESPECTFULLY SUBMITTED at the United States Courthouse, Miami, Florida this 8th day of April, 2020.

JOHN J. O'SULLIVAN
CHIEF UNITED STATES MAGISTRATE JUDGE